RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0384p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SAMUEL MORELAND,

　　　　　　　*Petitioner-Appellant,*

　　*v.*

　　　　　　　　　　　　　　　No. 09-3528

MARGARET BRADSHAW, Warden,

　　　　　　　*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:05-cv-334.
Thomas M. Rose, District Judge; Michael R. Merz, Magistrate Judge.

Argued: April 18, 2012

Decided and Filed: November 15, 2012

Before: BOGGS, ROGERS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Justin C. Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Justin C. Thompson, Melissa J. Jackson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Samuel Moreland, an Ohio death-row prisoner, appeals a district court judgment denying his petition for a writ of habeas corpus. In 1986, a three-judge panel convicted Moreland of killing his girlfriend Glenna Green, her adult daughter, and three of her grandchildren. Moreland contends that his conviction is not

supported by sufficient evidence, that the trial court did not conduct an adequate evidentiary hearing on a child eyewitness's competence to testify, that the trial court wrongly excluded expert testimony concerning the child eyewitness, and that he was denied effective assistance of counsel.  For the following reasons, the district court properly rejected Moreland's claims and denied habeas relief.

I.

The facts of this case are taken largely from the opinion of the Supreme Court of Ohio, *Ohio v. Moreland*, 552 N.E.2d 894 (Ohio 1990).  At the time of the murders in November 1985, Samuel Moreland lived with his girlfriend Glenna Green in a home rented by Glenna's daughter, Tia Talbott.  Tia's boyfriend Thurston Jones and Tia's five children also lived at the residence.  On the night in question, Tia's sister Lana Green and Lana's three children were spending the night at the residence.

At approximately 10:30 p.m. on November 1, 1985, Tia, her boyfriend Thurston, and Lana's son Gregory left the residence to go to the grocery store.  Around the time of their departure, Moreland and his girlfriend Glenna began arguing over Glenna's refusal to give him money for alcohol.  Moreland left Glenna's bedroom, went to his own room, then returned and resumed the argument.  Glenna continued to refuse Moreland's request.  Moreland eventually left the house for about one-half hour, returned, argued with Glenna a third time, and left again for about ten minutes. Moreland returned to the home with a rifle and proceeded to shoot Glenna twice in the head.  He then shot Tia's eleven-year-old son Dayron Talbott in the hand and face and hit Dayron with the end of the rifle.  When Tia, Thurston, and Gregory returned home near midnight, they discovered the bodies of Lana Green, Violana Green, Glenna Green,

Datwan Talbott, and Daytrin Talbott.[1]  Dayron, Tia Green, and Glenna Talbott were injured but survived.[2]  Moreland had left the home by this time.

Later that night, Moreland met with Samuel Thomas.  Together, the two purchased alcohol and returned to Thomas's home.  While there, a car passed by the home and Moreland commented, "I bet it was a cruiser pass."  Thomas looked out of the window and saw a police cruiser passing by the residence.  Moreland also commented that he had shot a gun and the bullet hole "went in small and came out big."  Thomas testified that he did not understand what Moreland meant by this comment. Thomas later drove Moreland home, where police arrested Moreland.

While police read Moreland his *Miranda* rights, he told the arresting officer that the officer was "too late."  Moreland later proved uncooperative when the police attempted to swab his hands to perform an atomic absorption test to detect the presence or absence of gunshot residue.  During the test, Moreland commented that "[t]his isn't going to do any good anyway.  I've been firing three to four hundred rounds at a range in Vandalia."  When asked if he signed in and out at the range, Moreland changed his story and stated that he had been firing the shots along a river bank.  Moreland also made a number of statements that were eventually used against him at trial, including, "I have Fifth Amendment rights,"  "In fact, the Constitution is written for guys like me," and "You don't have any evidence against me, and I'll be damned if I'll help you."

At trial, Moreland presented testimony from an expert who estimated that Moreland would have had a blood alcohol level of between .30 and .36 around the time the murders were committed, suggesting that he would have been too intoxicated to carry out the acts as described.  However, in addition to Samuel Thomas, other witnesses reported seeing Moreland that night and called into question his intoxication defense.

---

[1] Glenna Green was Moreland's girlfriend; Lana Green was her adult daughter; Violana Green was Lana's daughter and Glenna's granddaughter; Datwan Talbott and Daytrin Talbott were Tia Talbott's sons and Glenna Green's grandsons.

[2] Dayron Talbott is Tia Talbott's son and Glenna Green's grandson; Tia Green is Lana Green's daughter and Glenna Green's granddaughter; Glenna Talbott is Tia Talbott's daughter and Glenna Green's granddaughter.

Bruce Shackleford saw Moreland at approximately 11:00 p.m. and testified that Moreland did not appear to be drunk nor did he have difficulty walking or talking. Richard Cunningham also saw Moreland and observed that Moreland did not seem to have difficulty walking.

Police subsequently recovered what they believed to be the murder weapon—a .22-caliber rifle. Because the rifle had been in an alley for weeks after the crime, it was discolored, rusty, and broken. Police linked the rifle to the crime after determining that bullets found in some of the victims' bodies matched that of a .22-caliber rifle. When police test-fired the rifle and compared the test bullets with the bullets found in the victims' bodies, they found that the two bullet types shared the same characteristics.

In April 1986, after Moreland waived trial by jury, a three-judge panel found Moreland guilty of the aggravated murders of Glenna, Lana, and Violana Green, and Daytrin and Datwan Talbott. Each of the five aggravated murders carried death penalty specifications, and the panel ultimately sentenced Moreland to death. Further, the panel found Moreland guilty of the attempted aggravated murders of Tia Green, Glenna Talbott, and Dayron Talbott, and sentenced Moreland accordingly. The panel acquitted Moreland of five counts of aggravated felony murder, three counts of attempted aggravated felony murder, one count of aggravated robbery, and the death specifications that the murders were committed to escape detection or apprehension and that they were committed in conjunction with aggravated robbery.

Moreland appealed his conviction and sentence to the Ohio Court of Appeals, which affirmed the decision of the trial court. *See Ohio v. Moreland*, No. 9907, 1988 WL 95894 (Ohio Ct. App. Sept. 16, 1988). The Ohio Supreme Court subsequently affirmed that decision, and the United States Supreme Court denied certiorari. *See Moreland*, 552 N.E.2d 894, *cert. denied*, 498 U.S. 882 (1990). Moreland next sought relief in state post-conviction proceedings. The trial court granted the State's motion for summary judgment. Moreland appealed and the Ohio Court of Appeals affirmed in part, but remanded the action for an evidentiary hearing to determine if Moreland had knowingly, voluntarily, and intelligently waived his right to trial by jury. After remand,

the trial court and the state court of appeals held that Moreland failed to prove that his jury trial waiver was invalid. The Ohio Supreme Court declined to accept Moreland's appeal for review.

Moreland filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising nine claims. The magistrate judge recommended that Moreland's habeas petition be denied on all grounds, but recommended certifying for appeal Moreland's claims (1) that his conviction for aggravated murder with prior calculation and design was not supported by sufficient evidence, (2) that the trial court failed to conduct an adequate evidentiary hearing into the competence of Dayron and the admissibility of his testimony, (3) that the trial court wrongly excluded expert testimony about Dayron's susceptibility to suggestion, (4) that counsel were ineffective in failing to object to gruesome photographs and in failing to object to Moreland's statements concerning his post-arrest assertion of *Miranda* rights, and (5) that counsel were ineffective at the penalty phase of his trial. The district court adopted the magistrate judge's recommendations in full. *Moreland v. Bradshaw*, 635 F. Supp. 2d 680 (S.D. Ohio 2009); *Moreland v. Bradshaw*, No. 3:05-cv-334, 2010 WL 99263 (S.D. Ohio Jan. 6, 2010). Moreland timely appealed.

II.

## A. Sufficiency of the Evidence[3]

The Supreme Court of Ohio reasonably applied clearly established federal law in deciding that sufficient evidence supported Moreland's convictions for committing aggravated murder with prior calculation and design. Moreland filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The provisions of that act therefore apply in this case. *Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997). Under AEDPA's deferential standard, a writ

---

[3]Moreland did not argue before the district court that the State produced insufficient evidence of attempted aggravated murder; nor did the district court certify this claim for appeal. We will therefore not consider that claim. *See Post v. Bradshaw*, 621 F.3d 406, 415 (6th Cir. 2010) *(citing Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir. 1983)).

may be granted only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). We apply two layers of deference in reviewing habeas claims challenging evidentiary sufficiency. *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)). "First . . . we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* (citing 28 U.S.C. § 2254(d)(2)). The Ohio Supreme Court did not unreasonably determine the facts when it held that sufficient time and opportunity existed for Moreland to plan and commit the acts and that the circumstances of the crime showed a scheme to implement the calculated decision to kill. *See Moreland*, 552 N.E.2d at 903. Thus, the district court properly held that the Ohio Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

The Ohio Supreme Court reasonably determined that, taking the evidence in the light most favorable to the State, a rational trier of fact could have found that Moreland killed the victims with prior calculation and design. Under Ohio law, "No person shall purposely, and with prior calculation and design, cause the death of another." Ohio Rev. Code Ann. § 2903.01(A) (West 1996) (amended 1996). "Instantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Ohio v. Cotton*, 381 N.E.2d 190, 192 (Ohio 1978). However, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill," such a finding is justified. *Id.* The Ohio Supreme Court reasoned that Moreland's shooting of Glenna did not occur as a result of an instantaneous deliberation but rather after Moreland had sufficient time and

opportunity to plan the act. The argument began when Glenna refused to give Moreland money for alcohol. After arguing with Glenna, Moreland left the house for approximately one-half hour, returned, resumed the argument, then left the house again. Thus, Moreland removed himself from not only the person with whom he was angry, but the place where the argument occurred. About ten minutes after leaving, Moreland returned with a rifle and killed Glenna before turning the rifle on Dayron. He then killed or attempted to kill all the people in the household. According to the Ohio Supreme Court, Moreland had sufficient time and opportunity to plan the acts. *Moreland*, 552 N.E.2d at 903. Additionally, the court determined that the circumstances of Moreland's killing or attempting to kill all the witnesses in the household showed a scheme to implement the calculated decision to kill, which justified the finding of prior calculation and design. *Id.*

The supreme court also held that the evidence was sufficient to show that Moreland was not so intoxicated as to render him incapable of prior calculation and design. Moreland claimed that he was incapable of formulating a scheme to kill in his intoxicated state. Moreland's expert presented evidence of Moreland's estimated level of intoxication at the time of the crimes, placing his blood-alcohol level between .30 and .36. The expert testified that he would have been in a stuporous stage and on the verge of a coma with a blood-alcohol level in that range. Yet as the Ohio Supreme Court noted, the State presented contrary evidence on this point. *Id.* Bruce Shackleford, who observed Moreland around the time of the murders, testified that Moreland did not appear to be drunk or have difficulty walking or talking. Samuel Thomas testified that he and Moreland drank alcohol *after* the murders. Finally, Dayron testified that Moreland, at the time of the crimes, reloaded the rifle, suggesting he remained capable of performing this act. *Id.*

The supreme court ultimately viewed the question of whether Moreland acted with prior calculation and design as an issue of fact. *Id.* The supreme court found the evidence sufficient to warrant the conclusions reached by the three-judge panel in the panel's weighing of the evidence and determinations of witness credibility. *Id.* at 903-

04. The supreme court concluded by stating that the panel must have determined that Moreland's intoxication (if he was intoxicated at all) did not negate the finding of prior calculation and design.

Moreland first attacks the supreme court's determination on the ground that Dayron's testimony at trial was inconsistent, inaccurate, and unreliable when compared with the story he told his father after the shooting happened. However, this argument essentially concerns a credibility determination reserved for the trier of fact. Dayron initially told his father that he fell asleep, he awoke to an argument between Moreland and his grandmother, and the shooting happened immediately thereafter. At trial, however, Dayron testified that he saw Moreland leave two or three times and return the last time with a gun, providing the state with evidence of prior calculation and design. Thus, the three-judge panel was left to make a credibility determination. "[U]nder *Jackson* [*v.Virginia*], the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review." *Brooks v. Tennessee*, 626 F.3d 878, 899 (6th Cir. 2010) (Daughtrey, J., concurring) (quoting *Schlup v. Delo*, 513 U.S. 298, 330 (1995)).

Moreland also contends that the Ohio Supreme Court's reasons for finding sufficient evidence of the scheme to implement the calculated decision to kill were objectively unreasonable. In Moreland's view, the supreme court erred by basing its analysis on "the circumstances of appellant's killing or attempting to kill *all the witnesses* in the household [which] showed a scheme to implement the calculated decision to kill." *Moreland*, 552 N.E.2d at 903 (emphasis added). Moreland argues that this finding is inconsistent with the three-judge panel's finding of not guilty on the specifications alleging that Moreland killed the victims to escape detection. Moreland's reading confuses the issue. The three-judge panel could reasonably have found that, in killing or attempting to kill everyone in the house, Moreland evidenced "a scheme to implement the calculated decision to kill" without also finding that Moreland had the specific purpose to prevent the victims from identifying him as the murderer. In any event, the Ohio Supreme Court's use of the word "witnesses" in its decision was not objectively unreasonable.

Finally, Moreland challenges his identification as the killer, albeit within the context of his prior calculation and design argument. He claims that there is reasonable doubt as to whether he was even the perpetrator, let alone that he acted with prior calculation and design. In his brief to the Ohio Supreme Court on direct appeal, Moreland divided this argument into two separate propositions of law. He argued in his eighth proposition of law that there was insufficient evidence of prior calculation and design, and he argued in his ninth proposition of law that the weight of the evidence did not support his identification as the killer. After rejecting his prior calculation and design argument, the supreme court rejected his argument that his conviction went against the manifest weight of the evidence. The supreme court held that the evidence established his guilt beyond a reasonable doubt. *See id.* at 904. In Moreland's federal habeas petition, he presented the claims as one issue involving prior calculation and design. Moreland's fifth ground for relief stated:

> Samuel Moreland was found guilty of Aggravated Murder (counts) based upon insufficient evidence. The only eyewitness to the killings was an eleven year old boy who identified someone other than Mr. Moreland as the perpetrator of these deaths. The identification of Mr. Hagans as the perpetrator was made to the first person who encountered the child witness at the scene. The child subsequently changed his statement and implicated Mr. Moreland.

Petition, R. 14, Page I.D. 77. Although the district court considered testimony tying Moreland to the crimes and testimony establishing that he acted with prior calculation and design, the district court did not specifically address Moreland's argument that someone else committed the crimes.

Whether a defendant acted with prior calculation and design and whether a defendant in fact committed the crime at issue are two distinct arguments. This challenge is arguably not within the scope of the certificate of appealability and therefore not properly before this court. *See Hill v. Mitchell*, 400 F.3d 308, 329, 335 (6th Cir. 2005). However, granting Moreland the benefit of the doubt that he properly presented the issue and that the issue fell within the scope of the certificate of appealability, his claim still lacks merit. Multiple pieces of evidence, including eyewitness testimony,

Moreland's admission that he shot a gun near the time of the murders, the drops of blood found on Moreland's clothes that matched the blood types of two of the victims, and evidence showing that Moreland argued with Glenna immediately before the murders, support his identity as the killer.

First, the eyewitness, Dayron Talbott, *identified* Moreland as the shooter of Dayron and his grandmother Glenna Green. *Moreland*, 552 N.E.2d at 901. An atomic-absorption test performed on Moreland after his arrest indicated that he probably had discharged a firearm. *Id.* at 899-901. In any event, Moreland admitted firing a gun. He claimed that he had been firing three to four hundred rounds at a gun range. When an officer asked if he signed in and out at the range, Moreland changed his story and said that he had been firing the shots along a riverbank. *Id.* at 897, 901-02. Also, the bloodstains on Moreland's pants matched the blood types of two of the victims. *Id.* at 901.

The timing element also supports a finding that Moreland was the killer. When Tia, Thurston, and Gregory left the home to go shopping, ten people remained in the house. When the shoppers returned approximately ninety minutes later, only two of the ten were still living and unwounded: four-year-old Daniel and Moreland, who had left the residence. Viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the unwounded, missing adult who had previously been in the house perpetrated the crimes.

Moreland challenges on several bases the conclusion that he committed the crimes. Each argument ultimately fails. First, Moreland's argument involving the lack of blood found on him upon arrest—only a few drops were found on his pants and on the right side of his shirt, but none on his hands, body, jacket, shoes, or socks—comes down to a credibility determination. On one hand, Dayron identified Moreland, someone he knew well, as the killer. On the other hand, Moreland points out, a great deal of blood surrounded each victim and first-responders referred to the crime scene as a "slaughterhouse." The coroner testified that there would have been heavy bleeding and blood spattering as the injuries were inflicted. Moreland argues that it is unlikely that

(indeed, unfathomable how) he committed these crimes while getting so little blood on himself. He likewise points to evidence that, at the time of the crimes, he was already so intoxicated that he was in a stuporous stage, verging on a coma. In such a condition, he argues, it is "incredibly unlikely" that he would have avoided being covered with blood spatter or cleaned himself off so well afterward. He also points to evidence that he put on mismatched socks, one green, one white, earlier that evening before the crimes, yet he had those same socks on when arrested without blood on them. Responding to an argument that the prosecutor made at trial—that Moreland might have changed his clothes after the crimes—he contends that this is speculation not supported by evidence. Instead, Moreland offers another explanation for the few drops on his clothes: that night, while out with a companion, Moreland took a bloody $20 bill out of the pocket of a man who had collapsed in the street. Finally, Moreland notes that no forensic evidence or testimony connected him to the rifle police found in an alley weeks after the crime that they believed to be the murder weapon.

The blood argument equates to an attack on the eyewitness's credibility—a determination that is exclusively the province of the trier of fact. *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994). In general, attacks on witness credibility are "simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984)). The three-judge panel heard testimony about the scarcity of blood on Moreland's clothes, *see Moreland*, 552 N.E.2d at 902, but chose to believe Dayron when he identified the man he saw attack him and kill his grandmother. Likewise, the three-judge panel heard testimony regarding the lack of physical evidence connecting Moreland to the murder weapon. The panel presumably placed less emphasis on this evidence. These determinations appropriately rested with the panel.

Further, the mismatched socks are irrelevant since, by Moreland's own admission, evidence that he put on the socks before the crimes were committed was not presented until the penalty phase. This issue therefore does not factor into the analysis

of whether sufficient evidence was presented at the *guilt* phase to justify conviction. *Cf. Herrera v. Collins*, 506 U.S. 390, 402 (1993); *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

Also, Moreland's alternative explanation for the blood only means that the triers of fact had before them conflicting inferences about the source of the blood. "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326; *see Wright v. West*, 505 U.S. 277, 296–97 (1992) (plurality opinion). Further, the prosecution is not under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 326.

Moreland's primary argument in disputing his identity as the killer is that Eugene Hagans, Tia's ex-boyfriend, committed the murders. At the scene of the crime, a firefighter asked Dayron (who had been shot and beaten) who did this to him. The firefighter thought Dayron said "Higgins" or "Hagans." In the ambulance, a paramedic asked Dayron the same question and his answer sounded like "Liggins, Hagans, Higgins." In the emergency room, Dayron told the doctor he did not know who was responsible. Dayron's father and his great-grandmother also questioned Dayron in the hospital before he saw police. Dayron identified the perpetrator as his "mother's boyfriend." When asked if he meant his grandmother's boyfriend—meaning Moreland—Dayron responded yes. Further, Dayron's mother Tia explained to police that Hagans had called and threatened her and her family. The timing of these threats, however, was not entirely clear. Tia had previously filed at least 14 criminal complaints against Hagans, and on one occasion she shot Hagans in the chest after he refused to leave her home. When police went to Hagans' residence on the night of the murders, they found him in his basement wearing only underwear and speaking with his brother. Police recovered Hagans' jacket, which had at least three human-blood stains on it, one matching Hagans' blood type and two others matching two of the victims' blood types.

The panel was entitled to hear testimony suggesting that someone other than Moreland may have been responsible for the crimes but nevertheless conclude that the State presented a more compelling case.

Finally, Moreland's attempt to equate the facts of his case with those found in *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003), misses the mark. The eyewitness in *McKenzie* was three years old at the time of the incident and was deemed incompetent to testify. *Id.* at 727–28. Aside from a statement the child made to her grandmother the day after the assault, no other physical evidence or eyewitness testimony linked the petitioner to the crime. Thus, the prosecution's reliance on the statement of the child in convicting the petitioner was deemed unwarranted. In Moreland's case, the child eyewitness was deemed competent to testify and other evidence connected Moreland to the crime.

In the end, a rational trier of fact could have found beyond a reasonable doubt that Moreland committed the murders with prior calculation and design. "[E]ven were we to conclude that a rational trier of fact could not have found [the defendant] guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (emphasis omitted). Because the Supreme Court of Ohio did not unreasonably apply, or rule contrary to, Supreme Court law, the district court properly denied habeas relief on this claim.

**B. Trial Court Error: Competency Hearing and Expert Testimony[4]**

Moreland's due process rights were not violated by the trial court's failure to conduct a competency hearing on Dayron Talbott or by the trial court's exclusion of

---

[4]Moreland did not procedurally default his claim that the trial court conducted an inadequate evidentiary hearing on the competency and admissibility of eleven-year-old Dayron Talbott's testimony; nor did Moreland default his claim that the trial court erred in excluding expert-opinion testimony on Dayron's susceptibility to suggestion and the influence of others. The district court held that Moreland procedurally defaulted these claims because he did not present the claims to the state courts as federal claims. However, for both claims, Moreland argued in his brief to the Ohio Supreme Court that the alleged errors violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. That statement sufficiently preserved his argument to avoid default. *See Sheppard v. Bagley*, 657 F.3d 338, 347 (6th Cir. 2011).

expert testimony by Dr. Michael Williams concerning Dayron's susceptibility to suggestion and influence. The Ohio Supreme Court rejected both claims on state-law grounds. *See Moreland*, 552 N.E.2d at 898-99. The supreme court held that the trial court's decision to conduct an interview with Dayron without holding a full evidentiary hearing did not amount to an abuse of discretion because under Ohio law eleven-year-old Dayron was presumed competent to testify. *See* Ohio R. Evid. 601 (stating that every person is competent to be a witness except: "(A) Those of unsound mind, and children under ten (10) years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."). The supreme court also concluded that the trial court's exclusion of Dr. Williams's testimony was not in error because, under Ohio law, an expert may not testify as to the expert's opinion of the truth or falsity, or accuracy or inaccuracy, of the statements of a child declarant. The supreme court, however, did not address Moreland's argument that the trial court decisions violated his due process rights. Because the Ohio Supreme Court only considered the merits of these claims on state law grounds, AEDPA deference arguably does not apply under this court's holdings prior to *Harrington v. Richter*, 131 S. Ct. 770 (2011), and *Early v. Packer*, 537 U.S. 3 (2002) (per curiam). *See Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)). *Richter* and *Packer* appear to require AEDPA deference where a federal issue has been raised but the state court has denied the claim with a discussion solely of state law. *See Childers v. Floyd*, 642 F.3d 953, 968–69 (11th Cir. 2011). The Supreme Court has recently granted certiorari in a case that may definitively resolve this issue. *See Cavazos v. Williams*, 132 S. Ct. 1088 (2012). We need not anticipate the Supreme Court's ultimate ruling on the issue, however, because even free of AEDPA deference, Moreland has not established due process violations. His claims are essentially state-law issues, which are not cognizable in federal habeas review.

First, the trial court's failure to conduct a competency hearing for Dayron did not deprive Moreland of his due process rights because the procedures followed by the trial court were fundamentally fair. Although the Confrontation Clause guarantees a defendant the right to be confronted with the witnesses against him, U.S. Const.

amend. VI, and this right includes as one of its elements that those witnesses be competent to testify, *Maryland v. Craig*, 497 U.S. 836, 851 (1990), the right does not necessarily guarantee a defendant a hearing on a witness's competence to testify. While not required to do so under Ohio law, the trial court interviewed Dayron in chambers to determine whether he could distinguish between truth and falsity. Moreland and all counsel were present for the interview. The panel posed a series of questions to Dayron, including, "Do you know what it means to take an oath to tell the truth?" and "Do you know what the difference is between the truth and telling a lie?" Judge Porter also asked Dayron his name, age, school, the meaning of a lie, and what happens when one tells a lie. Judge Kessler then commented that Dayron "appeared to be alert, bright, [and] intelligent."

Moreland has not shown that this procedure was fundamentally unfair. In general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review. *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011) (citing *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001)). A federal court may nevertheless grant relief in cases where "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." *Id.* To show a due process violation under AEDPA rooted in an evidentiary ruling, this court has typically required a Supreme Court case establishing a due process right with regard to that specific kind of evidence. *Id.* (citing *Maldonado v. Wilson*, 416 F.3d 470, 477 (6th Cir. 2005)). Moreland points to no clearly established Supreme Court precedent governing how a state competency hearing is to be conducted. Indeed, the Supreme Court has not set forth a definition of witness competence required by the Due Process Clause, nor has the Court established a precise age below which a competency hearing would be required. *See Kentucky v. Stincer*, 482 U.S. 730, 741 n.11 (1987) (citing *Wheeler v. United States*, 159 U.S. 523, 524 (1895)). The Supreme Court has recognized that requirements for competency determinations vary by state, with some states explicitly allowing children to testify without requiring a prior competency qualification and others deeming all persons, including children, competent unless otherwise limited by statute. *Id.* at 742 n.12. When competency hearings with children are conducted, the questions generally focus on

matters unrelated to the basic issues of the trial and instead include questions such as "their names, where they go to school, how old they are, whether they know who the judge is, whether they know what a lie is, and whether they know what happens when one tells a lie," *id.* at 741—the same questions posed to Dayron by the panel in chambers.

Further, even though the three-judge panel did not permit Moreland's attorney to question Dayron during the interview, Moreland does not dispute that his attorney had wide latitude in cross-examining Dayron at trial. In general, the right to confront adverse witnesses is satisfied "if defense counsel receives wide latitude at trial to question witnesses." *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

In sum, Moreland has not shown that the failure to conduct a competency hearing violated his due process rights. To the extent Moreland argues the trial court's decision violated state law, that claim is not cognizable on federal habeas review. *Collier*, 419 F. App'x at 558.

Next, Moreland's due process rights were not violated by the trial court's exclusion of Dr. Williams's expert opinion. Moreland sought to introduce the expert opinion of Dr. Williams, a child psychologist, who would have testified that Dayron, a "parentified" child, would more likely relate events in a way consistent with the perspective of his mother Tia. This exclusion, claims Moreland, denied him the right to present a defense, violated his right to due process, and violated his right to a fair and reliable trial. However, "a habeas petitioner does not have a constitutional right to the presentation of expert testimony on the reliability of eyewitness identification." *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001); *see Moore v. Tate*, 882 F.2d 1107, 1110-11 (6th Cir. 1989). Also, as the Ohio Supreme Court held on direct appeal, Moreland's challenge regarding expert testimony is essentially a state-law issue.[5] *Moreland*,

---

[5]Moreland re-raised the claim in post-conviction proceedings, where the state court of appeals held it barred by res judicata. *Moreland*, 2000 WL 5933, at \*5. The district court held the claim not only procedurally defaulted, but meritless because it presented only an issue of state law.

552 N.E.2d at 899.  His claim is therefore not appropriate for federal habeas corpus review.

Moreland argues that in the aftermath of the murders, Dayron's family, police, and prosecutors pressured Dayron to identify Moreland as the killer.  For this reason, Moreland claims an expert opinion was needed to explain that Dayron's version of events did not result from his own independent recollection.  Moreland contends that Dayron's identification of Moreland contradicts Dayron's preliminary identification of his mother's ex-boyfriend, Eugene Hagans, as the killer.  In the five months leading to trial, Moreland claims that Dayron's family members repeatedly reinforced the idea that Moreland was the killer.  A social service worker, Carolyn Lander, testified that she visited Dayron between twenty and twenty-five times during this period.  She explained that friends, relatives, and other people talked frequently about the crime in Dayron's presence.  Lander also stated that these people told Dayron that he knew who had done this to him and he would be able to say so when asked.  Some individuals specifically identified Moreland as the perpetrator of the crimes.  In addition, Tia told Dayron that the case rested on him.  Moreland argues that these statements, combined with questioning by police and prosecutors, reinforced the idea that he was guilty.

The three-judge panel allowed Dr. Williams to testify about "parentification" and precluded him only from offering his expert opinion on the accuracy of Dayron's testimony because, under Ohio law, "[a]n expert may not testify as to the expert's opinion of the truth or falsity, or accuracy or inaccuracy, of the statements of a child declarant." *Moreland*, 552 N.E.2d at  896 (citing *Ohio v. Boston*, 545 N.E.2d 1220 (Ohio 1989)).  The panel heard testimony from Dr. Williams that a parentified child views the parent more as an equal than as an authority figure, and seeks to please the parent.  The child tries to meet the parent's needs more so than the parent meets the child's needs.  Also, the parentified child is more inclined to do what he or she can to reduce the pressures, stresses, and needs of the parent.  Dr. Williams testified that Tia told Dayron in his presence that "she'd be glad when the trial had come and gone and Sam Moreland got what was coming to him."  The panel only excluded Dr. Williams's

opinion that Dayron's version of events was more likely the product of influence from his mother, detectives, prosecutors, and social workers. Dr. Williams proffered his conclusion for the record, though the judges excused themselves from the courtroom when he gave his remarks.

Moreland argues that the state-court determination to exclude this category of testimony was so fundamentally unfair as to deny him due process. Moreland essentially argues that the Constitution *ought* to require the admission of such evidence. However, the Supreme Court has made clear that "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). The Supreme Court has also explained that an "accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Egelhoff*, 518 U.S. at 42 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). Considering the wide latitude afforded to states regarding evidentiary matters under the Due Process Clause, and Moreland's failure to show that the trial court's ruling violated a fundamental principle of justice, we cannot say that Moreland's due process rights were violated by the exclusion of this testimony.

Moreland argues that *Buell v. Mitchell*, 274 F.3d at 359, upon which we rely above, did not categorically hold that no constitutional right exists allowing for the presentation of expert testimony on the reliability of eyewitness testimony. He contends that the reason we found no constitutional error in *Buell* in excluding the expert testimony was that the evidence of Buell's guilt was based primarily on physical evidence, rather than identification testimony. Also, Buell never argued that the expert testimony in question fell under an exception to the Ohio rule forbidding such evidence. Moreland claims that, unlike in *Buell*, very little physical evidence connected him to the crime. Moreland also argues that Dayron suffered from mental and physical impairments affecting his ability to observe and recall events, and Ohio law permits expert testimony about the credibility of an identification if the eyewitness suffers from

a mental impairment that affected his or her ability to recall events. *See Ohio v. Buell*, 489 N.E.2d 795, 804 (Ohio 1986).

That identification testimony assumed a greater role in Moreland's conviction than in Buell's does not mean that Moreland's constitutional rights were violated. While not extensive, physical evidence did connect Moreland to the murders. As for Dayron's physical and mental status, the three-judge panel conducted an interview with Dayron in chambers to consider his competence (even though he was presumed competent under Ohio law). Our recognition in *Buell* that a habeas petitioner does not have a constitutional right to the presentation of expert testimony on the reliability of eyewitness identification did not depend on the distinctions pointed out by Moreland. *Buell*, 274 F.3d at 359 (citing *Moore v. Tate*, 882 F.2d 1107, 1110-11 (6th Cir. 1989)).

Moreland's reliance on *Ferensic v. Birkett*, 501 F.3d 469 (6th Cir. 2007), and *United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000), to demonstrate that the exclusion of eyewitness-identification expert testimony can violate a defendant's right to present a defense is also misplaced. *Ferensic* was concerned with a Michigan trial court's exclusion of otherwise admissible testimony as punishment for the defense's violation of a discovery order. 501 F.3d at 476, 478. The identity of the perpetrators was the central issue in *Ferensic*, and Ferensic repeatedly told jurors that he would present expert testimony on the inherent unreliability of eyewitness testimony. The trial court nevertheless excluded the testimony because Ferensic failed to provide the prosecution with a copy of the expert's report in the time frame set by the court. The expert, had he been permitted to testify, "would have informed the jury of *why* the eyewitnesses' identifications were inherently unreliable. This would have been a scientific, professional perspective that no one else had offered to the jury." *Id.* at 477. We concluded that, by excluding the testimony, the trial court showed disregard for the substantial rights of one party, Ferensic, in the absence of any prejudice to the other, the prosecution. *Id.* at 478. In Moreland's case, however, the panel permitted Dr. Williams to testify about *why* Dayron's version of events suffered from potential problems—Dr. Williams diagnosed Dayron as a parentified child. The panel only precluded Dr.

Williams from offering his opinion that Dayron would relate events in a manner more consistent with that of his mother. This exclusion did not prevent Moreland from presenting a defense or prejudice him as was the case in *Ferensic*. Further, while eyewitness testimony was certainly an important factor in Moreland's case as in *Ferensic*, other evidence connected Moreland to the crime, and that was not the case in *Ferensic*.

*Smithers* turned on whether the federal district court should have excluded the evidence without first holding a hearing to determine, under the appropriate standard, if the evidence met the requirements for admission. 212 F.3d at 314. Here, Moreland does not argue that the three-judge panel applied the wrong standard in excluding Dr. Williams's opinion. Also, unlike in Moreland's case, the district court in *Smithers* excluded the expert testimony in its entirety. Finally, in neither *Smithers* nor *Ferensic* did state law, or federal law in *Smithers*, forbid admission of the testimony. In Moreland's case, Ohio law does forbid such testimony. Moreland has thus not sufficiently shown that the exclusion of Dr. Williams's testimony impeded his right to present a defense.

To the extent Moreland argues that the exclusion of Dr. Williams's testimony violated state law, Moreland's claim is not appropriate for habeas review. We may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988).

## C. Ineffective Assistance of Counsel

### 1. Guilt Phase Ineffectiveness

Moreland raises three separate ineffective-assistance-of-counsel claims based on counsel's performance at the guilt phase of his trial. He argues: 1) counsel should have objected to the introduction of gruesome photographs, 2) counsel should have objected to the prosecution's use of Moreland's post-arrest, post-*Miranda* silence as evidence of his guilt, and 3) counsel should have objected to the use of Moreland's post-arrest, post-

*Miranda* statements as evidence negating his intoxication defense. Moreland has not established that he is entitled to habeas relief on any of these grounds.

First, because the Ohio Supreme Court's application of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), was neither contrary to federal law nor an unreasonable application thereof, Moreland cannot prevail on his claim of ineffective assistance of counsel based on his counsel's failure to object to gruesome photographs offered at his trial. In general, § 2254(d) sets forth a "high threshold" that requires a federal court to "ask whether it is possible [for] fairminded jurists [to] disagree that those [state court opinions] are inconsistent with the holding in a prior decision of [the Supreme] Court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402, 1403 (2011) (citing *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). The standard is "doubly deferential" when AEDPA is applied with *Strickland*. *Pinholster*, 131 S. Ct. at 1410. The question under § 2254(d) is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. In this case, the Ohio Supreme Court reasonably concluded that Moreland had not established prejudicial error satisfying the standard to succeed on his claim under *Strickland*.

Moreland identifies multiple photographs of the victims and autopsies to which he claims his counsel should have objected. On direct appeal, Moreland argued that the admission of the photographs constituted a trial court error; he also argued that his counsel's failure to object to the photographs constituted ineffective assistance of counsel. The Ohio Supreme Court held that, even assuming deficient performance, Moreland had not established prejudice. *Moreland*, 552 N.E.2d at 905. In analyzing Moreland's argument that the panel erred by admitting the photographs, the Ohio Supreme Court noted that "a few slides and photographs could have been excluded as cumulative or repetitive," but the court did not "find any indication that the panel was inflamed by the presentation of these photographs and slides." *Id.* at 901. The supreme court reasoned that the coroner's slides were illustrative of the coroner's testimony and related to the issues of prior calculation and design, as well as the nature and

circumstance of the murders. The court concluded that the probative value of the evidentiary materials outweighed any possible prejudice.**6**

As the Ohio Supreme Court reasonably determined, even assuming counsel performed deficiently, Moreland has not established that he was prejudiced. Nothing indicated that the three-judge panel was inflamed by the presentation of the photographs. The judges on the panel that heard Moreland's case are presumed to know the law and to apply it in making their decisions. *See Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997). Furthermore, judges are "presumed to base their judgment on relevant evidence." *Smith v. Mitchell*, 348 F.3d 177, 213 (6th Cir. 2003). These presumptions may be overcome only upon an affirmative showing of prejudice. *Id.* at 206 (citing *United States v. Joseph*, 781 F.2d 549, 552 (6th Cir. 1986)). Moreland has not made that showing.

Moreland primarily relies on the three-judge panel's sentencing opinion in attempting to refute this conclusion. There, the panel stated:

> The wounds and blunt force trauma sustained by all of the victims were shocking. The Defendant not only shot several of the victims, he brutally and intentionally followed a course of conduct whereby he actually crushed the skulls of several of his victims, some of whom were children under seven years of age.

Shocking and brutal though the violence revealed by the photographs may have been, these comments are not evidence that the judges were inflamed into ignoring or overstepping the law. These statements occurred in the context of the panel's explaining why aggravation outweighed mitigation. *Moreland*, 552 N.E.2d at 904-05. Although under Ohio law the nature and circumstances of the offense do not qualify as aggravating factors themselves, *Fox v. Coyle*, 271 F.3d 658, 669 (6th Cir. 2001), courts may consider the nature and circumstances of an offense in determining whether the aggravating

---

**6**The Ohio Supreme Court addressed the merits of Moreland's argument about the photographs in the context of a state-law evidentiary objection. *Moreland*, 552 N.E.2d at 900-01. In a separate section of the opinion, the court held that, even assuming deficient performance, Moreland was not prejudiced. *Id* at 905. Moreland agrees that the supreme court adjudicated this claim.

factors outweigh the mitigating circumstances.  *Id*.; *see also Ohio v. Stumpf*, 512 N.E.2d 598, 600 (Ohio 1987).  That is what occurred in this case.

Our decision is in line with our previous decision in *Smith v. Mitchell*, 348 F.3d at 206, in which we considered the effect of improper testimony by a prosecution witness concerning the defendant's lack of remorse and trial counsel's failure to rebut the testimony before a three-judge panel.  We concluded that "any inflammatory effect [on the judges] was de minimis."  *Id.*  Moreland claims that, due to their graphic nature, the photographs in his case must have had more than a de minimis effect.  The panel's decision to acquit Moreland of multiple counts, however, demonstrates its ability to draw distinctions and view the evidence in the appropriate light.  The panel found Moreland not guilty of five counts of aggravated felony murder, three counts of attempted aggravated felony murder, and one count of aggravated robbery.  The panel also acquitted Moreland of the escaping-detection and felony-murder aggravators.

Moreland also argues that, because the supreme court assumed without explaining that his counsel performed deficiently, we must review the performance prong of his *Strickland* claim *de novo*.  He concedes that the supreme court addressed the prejudice prong of his *Strickland* claim.  Even if we were to review counsel's performance under a *de novo* standard, we nevertheless defer to the supreme court's resolution of the prejudice prong and uphold its conclusion that Moreland cannot establish prejudice for purposes of *Strickland*.

Thus, the Ohio Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

Next, the Ohio Supreme Court's rejection of Moreland's ineffective-assistance-of-counsel claim regarding the use of his post-arrest, post-*Miranda* silence as evidence of his guilt was neither contrary to federal law nor an unreasonable application thereof.  According to *Doyle v. Ohio*, 426 U.S. 610, 611, 618-19 (1976), the prosecution may not use the silence of a defendant to impeach him if that silence occurred after his arrest and receipt of *Miranda* warnings.  The supreme court assumed that Moreland proved deficiency in his counsel's performance but concluded that he failed to establish that he

was prejudiced by that deficiency.  *Moreland*, 552 N.E.2d at 905.  We defer to that conclusion.

At trial, the prosecution elicited testimony from a police officer that, after Moreland had been arrested and given *Miranda* warnings, he did not ask what had happened at the scene of the crimes, nor did he inquire about the well-being of anyone in the house.  The prosecution also questioned another police officer who testified that Moreland did not ask questions about anyone in the house after he had been taken to the police station.  Moreland contends that the prosecution used this testimony to suggest that his lack of curiosity stemmed from guilty knowledge:  he did not need to ask, because he already knew, and he already knew because he was the one who had done the shootings.

On direct appeal to the Ohio Supreme Court, Moreland raised this argument as a prosecutorial-misconduct claim and as an ineffective-assistance-of-counsel claim. During oral argument before the supreme court, the State acknowledged that the prosecutorial acts constituted *Doyle* violations.  Because of this concession, the supreme court reached the merits of what would otherwise have been a forfeited claim—Moreland failed to object to one of the *Doyle* violations at trial and did not object on constitutional grounds to the other violation.  Nor did he present the issues to the court of appeals. The supreme court nevertheless found that any *Doyle* violation was harmless beyond a reasonable doubt.[7]  According to the supreme court, the evidence presented, absent the claimed *Doyle* violations, constituted overwhelming proof of Moreland's guilt. *Moreland*, 552 N.E.2d at 901.  The court considered Dayron's testimony that he saw Moreland shoot Glenna before being attacked himself.  The

---

[7]Moreland argues that, when a state court deems a constitutional error to be harmless, determining whether an error is harmless on habeas review requires this court to ask whether the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  In Moreland's view, the *Doyle* violation was substantial and injurious, and as a result the Ohio Supreme Court's finding of harmlessness was objectively unreasonable. Therefore, Moreland argues, the supreme court's conclusion is not entitled to deference. The Ohio Supreme Court's reasoning that the any *Doyle* violation was harmless beyond a reasonable doubt occurred in the court's analysis of Moreland's prosecutorial-misconduct claim—not in the court's consideration of his ineffective-assistance claim.  In any event, we would reach the same conclusion on Moreland's claim even reviewing his claim *de novo*.

evidence also showed that the rifle recovered by the police was the rifle used in the murders, and the butt-end of the rifle matched the imprint on Datwan Talbott's forehead. Further, the atomic absorption test performed on Moreland showed that he probably shot a gun, and the bloodstains on his pants matched the blood types of two of the victims. The court also considered Moreland's changing stories about shooting a rifle at a range and his odd statements to Samuel Thomas as further proof of guilt. *Id.* at 901–02. The court next noted that, on the night of the murders, a witness saw and heard a man who stated that he had killed his family, and evidence led to the conclusion that Moreland made the statement. Finally, the court reasoned that the three-judge panel was "presumed to have considered only relevant, material and competent evidence in arriving at its judgment," and the court could "find no evidence that the panel considered [Moreland's] post-*Miranda* silence in arriving at its verdicts." *Id.* at 902.

That presumption disposes of this claim. Judges are presumed to know the law and apply it in making their decisions, and to base their judgment on relevant evidence. *Lambrix*, 520 U.S. at 532 n.4. Hence, judges are likewise presumed to recognize constitutional violations and disregard any evidence that was unconstitutionally obtained. In the words of the Ohio Supreme Court, there is "*no* evidence that the panel considered appellant's post-*Miranda* silence in arriving at its verdicts." *Moreland*, 552 N.E.2d at 902 (emphasis added). Moreland points to no evidence to the contrary.

Moreland argues that the judges would have excluded the evidence sua sponte if they realized that it derived from a constitutional violation, but he misconstrues the law. The judges were not under an obligation to make Moreland's objections on his behalf. The failure to act (for example, to instruct the jury on a certain point of law) is not evidence of ignorance of the law. Even in a situation where a trial judge gave jurors an incorrect instruction on aggravating factors and then later imposed a death sentence after weighing the aggravating factors and mitigating circumstances, the Supreme Court presumed that the judge knew the law. In *Lambrix v. Singletary*, 520 U.S. 518 (1997), the state supreme court had already given a facially vague aggravator a limiting construction that rendered it constitutional. Despite this, the trial judge did not instruct

Lambrix's jury on that narrowed definition. The Supreme Court was thus confronted with the argument: because the trial judge had not given the jurors the narrowed construction, there was no reason to believe he had applied it himself when independently weighing aggravation against mitigation. The Supreme Court, however, refused to accept the contention that failure to instruct on a law displayed ignorance of it. Instead, the Supreme Court applied the presumption that trial judges are presumed to know the law and to apply it in making their decisions. *Id.* at 532 n.4. The presumption that the judges knew the law applies in this case.

The Ohio Supreme Court's conclusion that Moreland failed to establish that he was prejudiced by his counsel's performance is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Moreland is not entitled to habeas relief on this ground.

Finally, Moreland challenges the Ohio Supreme Court's rejection of his claim that his counsel were ineffective in failing to object on the basis of *Wainwright v. Greenfield*, 474 U.S. 284, 292, 295 (1986), to the prosecution's use of Moreland's invocation of his right to silence as evidence that he was not intoxicated. According to *Greenfield*, "silence" means not only muteness, but also "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Id.* at 295 n.13. Moreland claims that his statements regarding his right to remain silent were used against him and that counsel should have objected. The supreme court held that, even assuming deficient performance, Moreland had not established prejudicial error that in any way undermined the integrity of his convictions and sentence. *Moreland*, 552 N.E.2d at 905. We defer to the Ohio Supreme Court's determination, as it did not contravene or unreasonably apply Supreme Court precedent.

After Moreland was arrested and given his *Miranda* warnings, the police tried to swab his hands so that they could perform an atomic-absorption test for gunshot residue. According to the Ohio Supreme Court, Moreland acted in an "uncooperative" manner. *Moreland*, 552 N.E.2d at 897. Moreland made the following statements during this time: "I have Fifth Amendment rights," and "In fact, the Constitution is written for

guys like me." He also stated, "You don't have any evidence against me, and I'll be damned if I'll help you." *Id.* In closing arguments, the prosecutor relayed these statements when arguing that Moreland had not been so intoxicated as to be incapable of acting with prior calculation and design, contrary to his defense. Moreland argues that the prosecutor's use of his statements violated *Greenfield* and that his counsel should have objected.

The Ohio Supreme Court addressed Moreland's *Greenfield* argument in the context of his prosecutorial-misconduct claim. The court reasoned that Moreland's post-*Miranda* statements, not his silence, were used against him by the prosecution in negating his intoxication defense and that he had not established prosecutorial misconduct. *Id.* at 902. However, in the court's discussion of Moreland's ineffective-assistance claim, the supreme court stated: "Assuming *arguendo* that [Moreland] has proved a deficiency in counsel's performance, [Moreland] has failed to establish that he was prejudiced by the deficiency." *Id.* at 905.

We need not address whether Moreland's counsel were ineffective in not objecting to the alleged *Greenfield* violation, because the Ohio Supreme Court's determination on the prejudice issue, which was sufficient to reject the claim, was not an unreasonable application of Supreme Court precedent.

In *Strickland*, the Supreme Court explained that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Moreland has not made that demonstration in this case.

Moreland was tried by a panel of three judges who are presumed to know the law and apply it in their decisionmaking. *Lambrix*, 520 U.S. at 532 n.4. He has not affirmatively shown that this presumption should not apply here. Nothing indicates that

the three-judge panel relied on Moreland's statements when they evaluated his voluntary-intoxication defense. Indeed, the panel heard other evidence undermining Moreland's defense. Although Moreland's expert testified that his blood-alcohol level would have been between .30 and .36 at the time of the murders and that he would have been in a stuporous stage and on the verge of a coma, the State presented contrary evidence on this point. *Id.* Bruce Shackleford, who observed Moreland around the time of the murders, testified that Moreland did not appear to be drunk or have difficulty walking or talking. Samuel Thomas testified that he and Moreland drank alcohol *after* the murders. Finally, Dayron testified that Moreland, at the time of the crimes, reloaded the rifle, suggesting that he remained capable of performing this act. Thus, the State had already called into doubt Moreland's intoxication defense before relaying Moreland's statements to the three-judge panel. Again, nothing suggests that the panel considered those statements in their decisionmaking. Hence, Moreland has not shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

As a fallback argument, Moreland argues that the cumulative effect of counsel's errors should be considered in determining whether he has demonstrated a reasonable probability of a more favorable outcome. However, "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010) (quoting *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)). This argument therefore lacks merit.

**2. Sentencing Phase Ineffectiveness**

Finally, Moreland has not established that he is entitled to habeas relief based on the Ohio Court of Appeals' rejection of his ineffective-assistance-of-counsel claim at the sentencing phase of his trial. Under 28 U.S.C. § 2254(d), "we review the last state-court decision to reach the merits of the particular claims being considered." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc). "Claims of ineffective assistance of counsel as to the penalty phase of a capital proceeding are analyzed under the same

two-part *Strickland* standard described above, and in the context of capital sentencing, the Supreme Court has made clear that counsel's Sixth Amendment responsibilities include a duty to engage in a reasonable investigation concerning aspects of the defendant's background that would support a mitigation case." *Jackson v. Houk*, 687 F.3d 723, 743 (6th Cir. 2012) (citing *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003)). Moreland argues that his counsel (1) did not engage in a reasonable investigation and failed to obtain the services of a social worker in preparing for mitigation, (2) failed to interview and prepare his family members to testify, (3) failed to research Moreland's background and the effects of inner-city culture on his upbringing, and (4) failed to obtain his medical and school records. In rejecting Moreland's first three arguments in his petition for post-conviction relief, the Ohio Court of Appeals did not contravene or unreasonably apply Supreme Court precedent. The court of appeals did not address Moreland's claim that his counsel were ineffective in failing to obtain his school and medical records even though Moreland presented this claim. Regardless of whether we review that claim *de novo* or accord it AEDPA deference, Moreland has not established prejudice.

First, in rejecting Moreland's argument that a social worker was needed to assist trial counsel as a "mitigation specialist," the Ohio Court of Appeals did not contravene or unreasonably apply federal law. *Ohio v. Moreland*, No. 17557, 2000 WL 5933, at *10-11 (Ohio Ct. App. Jan. 7, 2000). Moreland claims that a social worker would have assisted in Moreland's penalty phase defense by: identifying, interviewing, and preparing witnesses; collecting all pertinent records; researching specific cultural factors that influenced Moreland's personality development; identifying and locating expert witnesses; and assisting in the penalty phase strategy. According to the court of appeals, an affidavit submitted by the social worker did not identify any discovery or evidentiary issue that the social worker would be more capable of researching than would a certified death penalty attorney. *Id.* at *11. Further, the court reasoned that counsel are presumed to be capable of preparing for trial on their own. *Id.* As a result, the court of appeals rejected this claim.

Moreland is correct that under *Wiggins v. Smith*, 539 U.S. at 524, counsel should make efforts to discover all reasonably available mitigating evidence. He nevertheless has not shown what evidentiary issue a social worker would have been better able to address than his own attorneys. As the court of appeals reasonably concluded, each of the tasks identified by the social worker in her affidavit were tasks capable of being performed by Moreland's own attorneys. Applying the doubly deferential standard of AEDPA and *Strickland* to the Ohio Court of Appeals' resolution of this claim, we agree that Moreland is not entitled to relief.

Second, the Ohio Court of Appeals did not contravene or unreasonably apply federal law when it rejected Moreland's claim that counsel were ineffective in failing to interview several family members who could have provided relevant testimony regarding the intergenerational history of alcohol abuse and violence in Moreland's family. In resolving this claim, the Ohio Court of Appeals noted that the only two people who presented affidavits in which they claimed they were not interviewed were Moreland's father and his maternal aunt. *Moreland*, 2000 WL 5933, at *13. Moreland's father's affidavit essentially recited facts regarding Moreland's history that indicated his mother was a violent alcoholic. *Id.* Moreland's aunt's affidavit covered this same topic. Also, the court noted that Moreland's counsel's affidavit specifically stated that Moreland's father was interviewed. *Id.* at *13 n.3. Further, the court of appeals explained that Moreland's father testified about Moreland's mother's history of alcoholism and violence during the mitigation phase of trial—the very topics addressed in his affidavit. Finally, even though Moreland's aunt did not testify, the court of appeals concluded that the averments contained in her affidavit were covered by the father's testimony. As a result, the court concluded that the failure to interview Moreland's aunt did not prejudice Moreland and his claim was properly denied.

In objecting to the court of appeals' analysis, Moreland argues that counsel failed to prepare his father to testify, but Moreland's father's assertions to that effect were contradicted by Moreland's counsel's affidavit. Moreland's father averred that he had no prior contact with Moreland's trial attorneys before testifying and that he did not

know what was expected of him. Yet Moreland's counsel claim that they interviewed his father. Further, even if Moreland's counsel did not adequately prepare Moreland's father for testifying, as his father claimed in his affidavit, the court of appeals concluded that Moreland's father's testimony at trial established the salient facts contained in his affidavit. *Id.*

Also, while Moreland is correct that contacting, in his words, "a handful of family members before trial" does not automatically render counsel's investigation constitutionally adequate, *see Johnson v. Bagley*, 544 F.3d 592, 602-03 (6th Cir. 2008), the additional testimony of the identified family members would have been cumulative and added little or no extra mitigating value, as was the case in *Sutton v. Bell*, 645 F.3d 752, 760 (6th Cir. 2011). Moreland's trial counsel confirmed that, in addition to his father, the only other family members they spoke with were Moreland's two brothers. But, as the court of appeals noted, the affidavit of Moreland's aunt essentially discussed the alcohol abuse and violence in Moreland's family—topics addressed by Moreland's father in his testimony. The affidavits submitted by Moreland's other relatives, including those of Kenny Obie, Mattie L. Willams, and Otis Ayers, add nothing new to this picture.

Moreland reads the court of appeals' analysis as addressing only whether there was prejudice under *Strickland*, and not as addressing whether counsel's performance was deficient. Even so read, the prejudice analysis was sufficient to support the court's rejection of the claim, and was not an unreasonable application of federal law under AEDPA.

Third, the Ohio Court of Appeals also did not contravene or unreasonably apply federal law in rejecting Moreland's argument that counsel were ineffective by failing to obtain a cultural expert to explain Moreland's background and the effects of inner-city culture on his development. Moreland claims that the three-judge panel never heard about "the psychological and psychosocial limitations with which he entered adulthood and which had their clear beginnings in a chaotic childhood, his alcohol dependence and drug usage and the severity of those conditions, and his dysfunctional and avoidant

pattern of coping with interpersonal conflict." Moreland submitted an affidavit of a social worker who would have testified that Moreland's upbringing in an inner-city environment helped to shape his development and that Moreland was, as the court of appeals noted in reviewing the affidavit, "locked into the culture totally." *Moreland*, 2000 WL 5933, at *10. According to the social worker, Moreland's background made him into a "maximum underachiever" who maintained his own level of integrity and ethics. *Id.* This information, he contends, would have assisted him in establishing the complexity of his relationships with the victims. Moreland also contends the evidence would have provided him with evidence of "strong provocation" for mitigation purposes.

The court of appeals held that it could not "conclude from this affidavit that the failure to procure such testimony at the guilt/innocence phase of trial fell below a reasonable standard or that it would have changed the outcome of the trial." *Id.* The court also saw this issue as one of strategy. The record indicated that trial counsel employed a strategy during the penalty phase emphasizing that Moreland's chronic alcoholism caused him to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Moreland's counsel contended that they emphasized this factor because they believed it to be Moreland's strongest argument. Counsel nevertheless stated that they also raised other mitigating factors, including provocation, but chose not to emphasize those factors as they were weaker arguments. The court of appeals held that the emphasis of one trial strategy over another did not rise to the level of ineffective assistance of counsel. *Id.*

The court of appeals' reasonably concluded that the failure to introduce this evidence did not fall below a reasonable standard and would not have changed the outcome of the trial. Moreland argues that the ABA standards in effect at the time of his trial required counsel to "explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (quoting 1 A.B.A. Standards for Criminal Justice 4-4.1, p.4-53 (2d ed. 1980)); *see also Wiggins*, 539 U.S. at 524. But "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to

assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Moreland's counsel believed that emphasizing the effect of Moreland's chronic alcoholism on his capacity to appreciate the criminality of his conduct constituted Moreland's strongest argument. Counsel nonetheless presented additional mitigating evidence, including evidence that addressed the statutory mitigating factor of its being "unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation." Ohio Rev. Code Ann. § 2929.04(B)(2).

The court of appeals alternatively concluded that the failure to introduce this evidence was not prejudicial. This separate conclusion, while not supported by articulated reasons, appears reasonable. We need not discuss it further, however, because the state court's adequate performance analysis is both reasonable and sufficient to uphold its decision.

Finally, Moreland has not shown that he is entitled to habeas relief on the ground that counsel failed to obtain his medical and educational records. Although Moreland presented this issue in his petition for post-conviction relief, the court of appeals did not address it. We need not determine whether AEDPA deference applies because the contention fails even on *de novo* review. Moreland has not established prejudice with respect to this claim. Although in *Poindexter v. Mitchell*, 454 F.3d 564, 578–79 (6th Cir. 2006), the failure to request medical, educational, and governmental records supported our conclusion that counsel failed to conduct a constitutionally adequate investigation, it is unclear how Moreland's counsel's failure to uncover these records would have presented any significant factors in assessing Moreland's background. The three-judge panel heard testimony from Dr. Arthur Schramm about Moreland's history of alcohol abuse. Moreland identifies no other relevant medical conditions about which the panel should have been informed. He also does not explain how his school records would have assisted the panel in understanding his background. Aside from claiming deficient performance on the part of counsel, Moreland leaves the court to speculate about what might be included in his records and how those records would have had any bearing on the outcome at sentencing. *Strickland* prejudice has not been shown.

III.

The judgment of the district court is affirmed.