RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DOUGLAS HARRIE STEWART,

        *Petitioner-Appellant*,

     *v.*

O'BELL "TOM" WINN, Warden,

        *Respondent-Appellee*.

No. 18-1204

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cv-00586—Robert J. Jonker, District Judge.

Decided and Filed: July 27, 2020

Before: STRANCH, READLER, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Kelly Ann Kulka, Roula Allouch, GRAYDON HEAD & RITCHEY LLP, Cincinnati, Ohio, for Appellant. John S. Pallas, Rebecca A. Berels, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. Douglas Harrie Stewart, Freeland, Michigan, pro se.

     MURPHY, J., delivered the opinion of the court in which READLER, J., joined. STRANCH, J. (pp. 11–14), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

     MURPHY, Circuit Judge. A Michigan jury convicted Douglas Harrie Stewart of the premeditated murder of his estranged wife, Venus Stewart. At trial Stewart's accomplice testified that Stewart persuaded him to help in the murder by claiming that Venus was harming

the couple's children and that, if she ended up killing them, Stewart would go on a "rampage" and "go after her family and the lawyers and prosecutors and jury[.]" Stewart moved for a mistrial based on his accomplice's testimony about what he had said, arguing that its inflammatory nature prejudiced him in the eyes of the jury. A state appellate court rejected Stewart's due-process challenge to the accomplice's testimony. This case asks: Was the state court's decision contrary to or an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1)? We answer no and affirm the denial of habeas relief.

I

Venus Stewart vanished on the morning of April 26, 2010. Venus's mother last saw her around 6:00 a.m. while leaving for work from their Michigan home. About two hours later, Venus's father was awakened by Venus's two young daughters playing in the home unsupervised. Venus's phone, keys, and purse were still in the home. Venus was not. No one saw her alive again.

An investigation quickly led the police to Stewart, Venus's estranged husband. Recently separated, the couple had what Venus's mother described as a "volatile" relationship. At the time of Venus's disappearance, Stewart was living in Virginia and Venus and their two daughters were living with Venus's parents in Michigan. When a Michigan police officer arrived at her parent's home, he encountered Venus's panicked mother saying "[h]e took her, he took her, he took her." In the backyard, police found the discarded packaging to an "Ozark Trail" tarp from Walmart. They identified Stewart's fingerprint on this packaging. They also later found a receipt from an Ohio Walmart on the floor of Stewart's truck. Video at this Walmart showed Stewart purchasing the tarp and a shovel on the evening before Venus's disappearance. A Walmart employee even recalled seeing Stewart in this store because of his "odd" outfit: Hawaiian-flowered swim trunks with an unmatching shirt.

The state charged Stewart with first-degree premeditated murder and conspiracy to commit murder. The evidence at his trial showed that he had concocted an elaborate scheme to travel to Michigan and kill Venus. A man named Ricky Spencer, Stewart's accomplice, was a key witness. Spencer was (according to his father) an "impressionable" 20-year-old living in

Delaware.  He befriended Stewart in 2008 while playing X-Box Live, a video-game system that connects gamers over the internet.  The pair did not meet in person until April 2010, the month of Venus's murder, when Spencer visited Stewart's Virginia apartment.

Spencer gave detailed testimony describing the murder plan.  Spencer would stay at Stewart's apartment—using Stewart's credit card and key fob and wearing Stewart's clothes—to make it appear as though Stewart had never left Virginia.  In the meantime, Stewart would drive to Michigan.  He would avoid toll roads, pay in cash at gas stations, and communicate with Spencer using prepaid cell phones.  Spencer also conveyed that Stewart planned to choke Venus and bury her at a preplanned spot.  Stewart's first attempt to execute this plan failed when an Ohio trooper pulled him over while en route to Michigan.  His second attempt succeeded.  According to Spencer, at around 8:20 a.m. on April 26, Stewart called him to say that he had lured Venus out of her parents' home and killed her.

Why would Spencer participate in this murder?  He testified that, during their initial meeting, Stewart convinced him that Venus had been abusing the couple's two daughters.  (Trial testimony showed that Venus was, in fact, a loving mother.)  Spencer initially rebuffed Stewart's requests for help, but Stewart eventually convinced him that the children were at risk.  Spencer recounted for the jury:

> He was telling me like, 'I talked to my dad already about this, and, you know, my wife is physically and mentally hurting my kids.  And, you know, if I wasn't – like if I wasn't a hundred-percent sure that my kids were going to be injured or, you know, killed by my wife, and if I don't do anything and I find out one day that they're injured or, you know, or dead, that I would go on a rampage.'
>
> And it wouldn't be like rampage like meaning like killing people, and it wouldn't be a, you know, just an instant thing.  He'd plan it out and go after her family and the lawyers and prosecutors and jury until like they stopped and figured out what – what was going on.

Allegedly convinced that Stewart's children were in danger, Spencer agreed to help Stewart create this false alibi.

Stewart did not immediately object to Spencer's "rampage" testimony, but he moved for a mistrial soon thereafter on the ground that the jurors might have understood Spencer's testimony as suggesting that Stewart was threatening them.  The trial court denied this motion.

The court interpreted Stewart's statements to Spencer to mean "that if something were to happen to his children by his wife that he would then go on a rampage against the Prosecutor and the jury that dealt with that issue, not in this case." In any event, the trial court added that the statement was offered not for its truth, but to provide context for how Stewart convinced Spencer to join the conspiracy. The court offered to instruct the jury to disregard the statement "if there's any confusion in that." Stewart's counsel never requested this kind of limiting instruction concerning Spencer's testimony.

After 12 days of evidence and three hours of deliberation, the jury convicted Stewart on both counts. He received a life sentence without the possibility of parole.

On appeal Stewart argued that the trial court should have granted a mistrial. With a lone citation to the Fourteenth Amendment, he invoked his due-process right to a "fair trial." The Michigan Court of Appeals rejected his argument based on state rules and authorities. *People v. Stewart*, 2012 WL 3966300, at *2 (Mich. Ct. App. Sept. 11, 2012) (per curiam). It agreed with the trial court that "[n]o reasonable person could construe [Stewart's] statement to Spencer about going on a rampage as a threat against [Stewart's] jury." *Id.* It thus found that the statement was not unduly prejudicial because any "danger that the jury would unfairly infer a threat directed at them was slight or nonexistent." *Id.* The testimony also "provided the context for highly relevant evidence of motive for murder." *Id.*

After the Michigan Supreme Court declined review, Stewart filed a federal habeas petition under 28 U.S.C. § 2254. Stewart's petition alleged in perfunctory fashion that he had been denied a fair trial "after the jury heard inflammatory testimony" about the threatened rampage. A magistrate judge recommended that the district court deny relief. The judge "indulgently addressed" this claim even though Stewart presented no supporting arguments, and rejected it on its merits. The district court adopted the judge's recommendation. We granted a certificate of appealability to consider this claim.

## II

The parties agree on two points. They agree that the state appellate court decided Stewart's due-process claim "on the merits," so Stewart must meet the standards in the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d).  *See*
*Johnson v. Williams*, 568 U.S. 289, 298–301 (2013).  They also agree that this case presents a
legal question for § 2254(d)(1), not a factual question for § 2254(d)(2).  Stewart thus must show
that the state court's decision was "contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court of the United States."  28
U.S.C. § 2254(d)(1).

Before a habeas petitioner can show that a state decision was "contrary to" or an
"unreasonable application of" an asserted principle, the petitioner must identify the Supreme
Court decision that "clearly established" the principle.  This "'clearly established' language"
requires a petitioner to rely "only on 'the holdings, as opposed to the dicta, of [the Supreme]
Court's decisions.'"  *Atkins v. Crowell*, 945 F.3d 476, 477 (6th Cir. 2019) (quoting *White v.*
*Woodall*, 572 U.S. 415, 419 (2014)).  When identifying what a Supreme Court decision actually
holds, the Supreme Court has told us not to frame the decision "at too high a level of generality."
*Woods v. Donald*, 575 U.S. 312, 318 (2015) (per curiam).  Take the Court's Confrontation
Clause caselaw as an example.  *See Nevada v. Jackson*, 569 U.S. 505, 511–12 (2013) (per
curiam).  The Court's decisions holding that the Confrontation Clause regulates state
"restrictions on a defendant's ability to *cross-examine* witnesses" do not also clearly establish
that the clause "entitles a criminal defendant to introduce *extrinsic evidence*" to impeach
witnesses.  *Id.*  And petitioners cannot turn the cross-examination holding into an extrinsic-
evidence holding merely by arguing that the Court's decisions create "a broad right to present
'evidence bearing on [a witness's] credibility.'"  *Id.* at 512 (citation omitted).  Such an overly
broad reading of the Court's holdings would allow federal courts to "transform even the most
imaginative extension of existing case law into 'clearly established Federal law, as determined
by the Supreme Court.'"  *Id.* (citation omitted).

Spencer's claim fails because he has not identified a Supreme Court holding that clearly
establishes his asserted legal rule.  He argues that the admission of certain evidence—Spencer's
testimony that Stewart told him that he would "go on a rampage" and go after the "jury" if Venus
were to harm his daughters—violated due process because it was irrelevant and inflammatory.
Yet Stewart identifies no Supreme Court *holding* clearly establishing that the Due Process

Clause bars this type of prejudicial evidence. To the contrary, the Supreme Court's holdings cut the other way. The Court has said: "The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process." *Lisenba v. California*, 314 U.S. 219, 228–29 (1941). So it has repeatedly rejected claims that prejudicial evidence violated due process. It has, for example, held that a court did not violate due process by admitting evidence of a six-month-old's prior injuries to prove that the defendant killed the child intentionally, not accidentally. *Estelle v. McGuire*, 502 U.S. 62, 67–70 (1991). It has held that a court did not violate due process by admitting proof of a defendant's prior crimes under a state's recidivism law. *Spencer v. Texas*, 385 U.S. 554, 563–69 (1967). And it has held that a court did not violate due process by admitting testimony "relating to an alleged crime that the defendant had previously been acquitted of committing." *Dowling v. United States*, 493 U.S. 342, 343–44, 352–54 (1990). In short, "state and federal statutes and rules," not the Due Process Clause, "ordinarily govern the admissibility of evidence" in criminal trials. *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).

The lack of a Supreme Court holding forecloses Stewart's habeas claim under our own precedent applying § 2254(d)(1) to this evidentiary context. We have held that a habeas petitioner's challenge to an "evidentiary ruling" cannot satisfy § 2254(d)(1) unless the petitioner identifies "a Supreme Court case establishing a due process right with regard to [the] *specific kind of evidence*" at issue. *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (emphasis added). Thus, when a petitioner challenged the admission of his prior crimes, we denied relief because "no clearly established Supreme Court precedent . . . holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512–13 (6th Cir. 2003). We reached the same result when a petitioner argued that an 11-year-old's testimony violated due process because a court had improperly evaluated the child's competency. *Moreland*, 699 F.3d at 923. The petitioner "point[ed] to no clearly established Supreme Court precedent governing how a state competency hearing is to be conducted." *Id.*; *see also, e.g.*, *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005).

These cases control this one. Like the petitioner in *Moreland*, Stewart identifies no Supreme Court holding barring the "specific kind of evidence" he challenges—his out-of-court

statements that allegedly inflamed the jury. 699 F.3d at 923. Because "there is no Supreme Court precedent that the [state] court's decision could be deemed 'contrary to,'" Stewart cannot satisfy § 2254(d)(1). *Bugh*, 329 F.3d at 513; *see Jackson v. Houk*, 687 F.3d 723, 737 (6th Cir. 2012).

Stewart's arguments do not convince us otherwise. He asserts that the state appellate court's decision was contrary to a slew of decisions: *Estelle*, *Lisenba*, *Payne v. Tennessee*, 501 U.S. 808 (1991), *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Berger v. United States*, 295 U.S. 78 (1935). Yet the "holdings" of these decisions do not clearly establish Stewart's proposed due-process rule. *Woodall*, 572 U.S. at 419. *Donnelly* and *Berger* did not even address the admission of evidence; they addressed prosecutorial misconduct. *Cf. Jackson*, 569 U.S. at 511–12. *Berger* reversed a conviction for that misconduct, but the phrase "due process" is noticeably missing from the opinion. 295 U.S. at 89. The case was "decided on direct review" when the Court could exercise its non-constitutional supervisory power over federal prosecutions. *Henley v. Bell*, 487 F.3d 379, 389 (6th Cir. 2007); *cf. Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam). And *Donnelly* rejected a due-process challenge to a prosecutor's closing arguments. 416 U.S. at 641–45; *see also Darden v. Wainwright*, 477 U.S. 168, 178–83 (1986) (same). A holding rejecting a due-process claim against prosecutorial misconduct does not "clearly establish" a due-process claim against something else—prejudicial evidence.

While *Estelle*, *Lisenba*, and *Payne* at least involved evidentiary challenges, their holdings likewise offer Stewart no support. *Estelle*'s holding, as noted, undercuts his claim: "We hold that [the petitioner's] due process rights were not violated by the admission of the evidence" of a six-month old's prior injuries. 502 U.S. at 70. So does *Lisenba*'s. There, the prosecution alleged that the defendant attempted to kill his wife with a rattlesnake bite and then drowned her. 314 U.S. at 224. When it brought the rattlesnakes into the courtroom as evidence, the defendant argued that "the sole purpose of the production of the snakes was to prejudice the jury against him and that those in the courtroom, including the jury, were in a panic as a result of the incident." *Id.* at 228. The Court flatly rejected the due-process claim against this reptilian evidence, noting that the Court did "not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence." *Id.* Lastly, *Payne*'s holding

did not concern the Due Process Clause. 501 U.S. at 811. It held that the Eighth Amendment did not categorically bar introduction of "victim impact evidence" at a capital trial's penalty phase. *Id.* at 827. All told, Stewart fails to identify a single Supreme Court *holding* that clearly establishes his asserted rule of prejudice.

Unable to rely on their holdings, Stewart plucks general statements out from the decisions to argue that due process bars "fundamentally unfair" procedures. When resolving the Eighth Amendment claim, for example, *Payne* noted: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825. And when rejecting the prosecutorial-misconduct claim, *Donnelly* used language suggesting that errors rendering a trial fundamentally unfair might violate due process: "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" 416 U.S. at 642 (quoting *Lisenba*, 314 U.S. at 236); *see also, e.g.*, *Estelle*, 502 U.S. at 75. Stewart's reliance on these snippets to satisfy § 2254(d)(1)'s requirement of "clearly established" law has two problems. Problem One: He relies on the "dicta" rather than the "holdings" in the Supreme Court's decisions. *Atkins*, 945 F.3d at 477 (quoting *Woodall*, 572 U.S. at 419). Problem Two: He "frame[s] the issue at too high a level of generality." *Woods*, 575 U.S. at 318; *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam); *Jackson*, 569 U.S. at 512. Stewart's reliance on the general rule that the Due Process Clause prohibits "fundamentally unfair" procedures—without a specific Supreme Court holding covering the type of due-process error he asserts—would allow courts to "transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" *Jackson*, 569 U.S. at 512 (citation omitted).

Our own AEDPA caselaw also offers Stewart no support for proposing a due-process right at perhaps the highest level of generality (a right to "fundamental fairness"). He mostly cites cases resolving pre-AEDPA habeas claims unencumbered by § 2254(d)(1)'s requirement of "clearly established" law. *See Coleman v. Mitchell*, 244 F.3d 533, 538, 542–43 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 515 n.30, 532 (6th Cir. 2000). After AEDPA, we have recognized

that a federal court may "grant relief in cases where 'the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation.'" *Moreland*, 699 F.3d at 923 (citation omitted). But we have added an important caveat: To succeed under § 2254(d)(1), a petitioner must identify a Supreme Court case that addresses the "specific kind of evidence" challenged. *Id.*; *see Simmons v. Balcarcel*, 2019 WL 2193321, at *2 (6th Cir. Apr. 2, 2019) (order); *Carter v. Horton*, 2017 WL 6418076, at *2 (6th Cir. Dec. 15, 2017) (order); *Collier v. Lafler*, 419 F. App'x 555, 558 (6th Cir. 2011); *Maldonado*, 416 F.3d at 477; *Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003); *Bugh*, 329 F.3d at 512–13. Stewart fails to identify such a case.

To be sure, one of our cases held that the admission of unreliable expert testimony violated due process under § 2254(d)(1)'s standards. *Ege v. Yukins*, 485 F.3d 364, 375–78 (6th Cir. 2007). In *Ege*, "critical" expert testimony suggested without foundation "that among the 3.5 million residents of the Detroit metropolitan area, [the habeas petitioner's] teeth, and *only* [her] teeth, could have made the mark on [the victim's] cheek." *Id.* at 376, 378 (citation omitted). *Ege* relied on *Chambers v. Mississippi*, 410 U.S. 284, 294–303 (1973), which held that a court violated due process by refusing to allow a capital defendant to cross-examine a witness and introduce testimony in support of the defendant's main defense that another person committed the murder. While *Chambers* involved the "improper *exclusion* of certain evidence," *Ege* reasoned, "its tenets are equally applicable to situations involving a state trial court's improper *admission* of certain evidence." 485 F.3d at 375. Yet *Ege* predates the Supreme Court's recent AEDPA teachings not to frame its "precedents at such a high level of generality." *Jackson*, 569 U.S. at 512; *see Woodall*, 572 U.S. at 426–27. And this case does not concern expert testimony. So we follow our precedent from both before and after *Ege* requiring a Supreme Court case on the "specific kind of evidence" that a habeas petitioner challenges. *Moreland*, 699 F.3d at 923; *Bugh*, 329 F.3d at 512–13.

Regardless, even under Stewart's high-level framing, he has not shown that the state court's decision was contrary to or an unreasonable application of any "fundamental-fairness" mandate. The state appellate court reasonably concluded that Spencer's testimony about Stewart's statement was not unduly prejudicial. *Stewart*, 2012 WL 3966300, at *2. Stewart's

statement that he would go on a "rampage" and go after Venus's "family and the lawyers and prosecutors and jury" was not a threat toward Stewart's actual jury, but a hypothetical description about what Stewart would do if Venus killed his children (an incident that never occurred). Because "[n]o reasonable person could construe [Stewart's] statement to Spencer about going on a rampage as a threat against [Stewart's] jury," "[t]he danger that the jury would unfairly infer a threat directed at them was slight or nonexistent." *Id.*

Nor was this isolated statement a "crucial" or "critical" factor in establishing Stewart's guilt. *Collier*, 419 F. App'x at 559 (quoting *Ege*, 485 F.3d at 375). Spencer's "rampage" testimony was "but one moment in an extended trial." *See Donnelly*, 416 U.S. at 645. The prosecutor did not mention it again. And substantial evidence proved Stewart's guilt. Spencer provided detailed testimony about the conspiracy, and other evidence corroborated his account. Security cameras captured Spencer, with his telltale habit of walking on his toes, parading around Newport News, Virginia, in Stewart's clothes and car. When Spencer dropped off a payment at the Virginia law firm that represented Stewart (another attempt at establishing an alibi), the receptionist was not fooled; she thought the "person who came into the office claiming to be Doug Stewart" was "a different type of person." Records from the Ohio Walmart showed that Stewart had purchased a shovel and a tarp on his way to Michigan. And packaging for the same type of tarp was found at the Michigan crime scene with Stewart's latent fingerprint.

Stewart's reliance on federal caselaw having run out, he ends by citing state rules or procedures that Spencer's testimony allegedly violated. Stewart contends, for example, that Spencer's testimony about what Stewart told him (a classic party admission) qualified as inadmissible hearsay and "bad acts" evidence, and also violated the parties' pre-trial stipulation. But we would ourselves act contrary to clearly established Supreme Court precedent if we used these state-law arguments as a basis for granting federal habeas relief. The Supreme Court's cases could not be clearer: "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67–68. For the most part, that is all Stewart has asked us to do here.

We affirm.

————————————

**DISSENT**

————————————

JANE B. STRANCH, Circuit Judge, dissenting. The Michigan Court of Appeals unreasonably applied clearly established Supreme Court precedent when it reviewed the irrelevant and threatening jury-rampage testimony at issue here. Because that unduly prejudicial testimony irreparably tainted the fairness of Stewart's trial, I respectfully dissent.

My disagreement with the majority opinion boils down to its conclusion that no Supreme Court holdings clearly establish the due process violation Stewart asserts. It is true that we must not frame a rule "at too high a level of generality," *Woods v. Donald*, 575 U.S. 312, 318 (2015) (per curiam), but it is equally true that "rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule," *Williams v. Taylor*, 529 U.S. 362, 382 (2000). "Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Id.* (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring)). One such rule is at issue here—when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). This rule "provides a general standard which calls for some examination of the facts," and "of course there will be variations from case to case" because we must examine whether the evidence introduced was unduly prejudicial. *Wright*, 505 U.S. at 308–09 (Kennedy, J., concurring).

The acceptance of this evidence-directed rule is shown by the cases the majority opinion cites for its assertion that state and federal statutes and rules, not the Constitution, typically govern the admissibility of evidence. Those cases also contain the clearly established rule that when evidence is so extremely unfair as to violate fundamental conceptions of justice, the due process clause provides a remedy. *See, e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (explaining that "when evidence 'is so extremely unfair that its admission violates fundamental

conceptions of justice,'" the Court has "imposed a constraint tied to the Due Process Clause." (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990))); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."). Rules and statutes do govern the admission of evidence; so does the Constitution.

The majority opinion also points to cases like *Lisenba v. People of State of California*, 314 U.S. 219 (1941), and *Estelle v. McGuire*, 502 U.S. 62 (1991), where the Supreme Court applied this general rule but found no due process violation based on its case-by-case examination of the facts. That some habeas petitioners lose when this general rule is applied to particular facts, however, does not prove that there can never be a due process violation when irrelevant inflammatory evidence is so unduly prejudicial as to affect a trial's fundamental fairness. And that evidence introduced in *Lisenba* and *Estelle* was not sufficiently prejudicial to make those trials fundamentally unfair is proof only of the nature of the rule—it "of necessity requires a case-by-case examination of the evidence." *Williams*, 529 U.S. at 382 (quoting *Wright*, 505 U.S. at 308 (Kennedy, J., concurring)). In short, this rule governing evidence must be applied to the particular facts and record of a case, including this one.

The rule was applied to the challenged evidence in *Lisenba* and the Court determined that the evidence did not so infuse the trial with unfairness as to deny due process of law. There, the habeas petitioner had allegedly attempted to murder his wife by procuring rattlesnakes to bite and kill her. 314 U.S. at 228. The prosecution introduced the snakes in evidence so they could be identified by a co-conspirator. *Id.* at 226. The petitioner argued that "the sole purpose of the production of the snakes was to prejudice the jury against him and that those in the courtroom, including the jury, were in a panic as a result of the incident." *Id.* at 228. The prosecution rebutted with a counter-affidavit and statement by the trial judge and with evidence that later in the trial "the snakes were brought into court at the defendant's request." *Id.* The Court concluded that the evidence was relevant and "the fact that evidence admitted as *relevant* by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason *alone*, render its reception a violation of due process." *Id.* at 228–29 (emphasis added).

It was significant in *Lisenba* that the inflammatory evidence was relevant to the underlying crime. Here the part of Spencer's testimony explaining that Stewart told him he would kill Venus if he learned she had hurt their children is likely probative of Stewart's motive to murder Venus. The testimony that Stewart "would go on a rampage" including undertaking a plan to go "after her family and the lawyers and prosecutors and jury" is not. R. 7-17, 2/28/11 Trial Transcript, PageID 2589. Disregarding the rampage evidence would not impact a jury's understanding of Stewart's motive, which was informed by the testimony that Stewart would kill Venus if he learned she had hurt their children. The rampage testimony's lack of relevance is important because determining whether evidence is "unduly prejudicial," *Payne*, 501 U.S. at 825, necessarily involves balancing its probative and prejudicial effects. It is true, as the Michigan Court of Appeals concluded, "[a]ll relevant evidence is prejudicial to some extent." But that begs the question here—whether it is an unreasonable application of Supreme Court precedent to find that the prejudicial effect of inflammatory, *irrelevant* evidence that threatens the jury is acceptable under the due process clause. Applying the general rule from *Lisenba*, *Estelle*, and elsewhere to this case shows that it is not acceptable.

Even if we assumed that the rampage evidence might have a modicum of relevance, moreover, it was still so unduly prejudicial as to disturb the trial's fundamental fairness under the due process clause. To start, accepting the state court's determination that the jury-rampage testimony was probative of Stewart's motive belies its contrary conclusion that the jury could not have felt threatened by the evidence. If fear that Venus was harming their children motivated Stewart to murder his wife, then according to Spencer's testimony, it would also motivate him to "go on a rampage," and "[h]e'd plan it out and go after her family and the lawyers and prosecutors and jury until like they stopped and figured out what—what was going on." R. 7-17, PageID 2589. Respondent argues that the jury could not have been threatened by this evidence because Stewart would only kill Venus and go on a rampage against a hypothetical jury *if* his children were harmed.

But Stewart was on trial for killing Venus—something he said he would do, according to Spencer, if he learned his children had been harmed. Stewart and Venus, moreover, had both alleged that the other abused their children. That the admitted statement implicated a

hypothetical jury and was made long before Stewart's jury was empaneled does not mitigate the intimidating nature of the testimony that Stewart's threats included a plan to keep going after a list of people, including the jury. To the contrary, the idea that Stewart would illogically go on a rampage against individuals not responsible in any way for harming his children could lead a reasonable juror to conclude that Stewart was unhinged. It does not take a leap of logic to conclude from his threat to a hypothetical jury, that Stewart could also be a threat to the empaneled jury—a jury that he might have a genuine motive to harm. The state court's conclusion that "[t]he danger that the jury would unfairly infer a threat directed at them was slight or nonexistent" is unsupported by its factual determinations and inconsistent with the Supreme Court's due process jurisprudence.

Because the record testimony shows that a reasonable juror could feel threatened by irrelevant testimony that the Defendant planned to go on a rampage and go after a jury, we cannot know whether the jury reached its verdict based on an impartial view of the evidence or in response to the irrelevant but threatening testimony that Stewart planned a rampage against a group that included the jury. Because "any ground of suspicion that the administration of justice has been interfered with" cannot "be tolerated," *Mattox v. United States*, 146 U.S. 140, 149 (1892), Stewart is entitled to a new trial.

For these reasons, I respectfully dissent.